**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**ANNA LEE JOHNSON,**

      **Plaintiff,**

**v.**                                **Case No.: 2:17-cv-01608**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

      This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 14, 17). The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be

**DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On August 9, 2013, Plaintiff, Anna Lee Johnson ("Claimant"), completed an application for DIB, alleging a disability onset date of May 3, 2010, due to fibromyalgia; hypothyroidism that caused short-term memory problems; muscle spasms in her back, neck, and shoulders; anxiety; insomnia; severe headaches lasting over a month; joint pain in every joint that was worst in the hips and knees; hand and wrist pain; hypercholesterolemia; disc degeneration and/or bone spurs at C3 through C7 and Luschka's joint spondylosis. (Tr. at 252-57, 271). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 166, 176). Claimant filed a request for an administrative hearing, which was held on September 24, 2015, before the Honorable Toby J. Buel, Sr., Administrative Law Judge ("ALJ"). (Tr. at 79-124.  By written decision dated October 26, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 56-78). The ALJ's decision became the final decision of the Commissioner on January 9, 2017, when the Appeals Council denied Claimant's request for review. (Tr. 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 14, 17). Consequently, the issues are fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 42 years old on her alleged onset date and 47 years old on her date last insured. (Tr. at 69). She has the equivalent of a high school education and

communicates in English. (Tr. at 270, 272). In the past, Claimant worked as a commercial cleaner, home health aide, cashier, and overnight stocker. (Tr. at 116-18).

### III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this

3

determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2015. (Tr. at 61, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since May 3, 2010, her alleged onset date, through her date last insured. (*Id.,* Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "fibromyalgia, degenerative disc disease of the cervical and lumbar spine, and headaches." (*Id.,* Finding No. 3). The ALJ also considered Claimant's hypothyroidism, hyperlipidemia, urinary tract infections, renal insufficiency, asymptomatic stage III chronic kidney disease, status post left wrist fracture, anxiety, and depression, but determined that these impairments were non-severe. (Tr. at 61-63). Under the third

inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 63, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except never climb ladders, ropes, or scaffolds and perform all other postural activity occasionally. She may have no exposure to heights, moving machinery, and hazards. The Claimant is afflicted with chronic pain noticeable to herself at all times, but could maintain attention and concentration in two-hour increments with normal breaks.

(Tr. at 63-69, Finding No. 5).

At the fourth step, the ALJ found that Claimant could perform her past relevant work as a cashier/checker. (Tr. at 69-70, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled and was not entitled to benefits. (Tr. at 71, Finding No. 7).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant asserts two challenges to the Commissioner's decision. First, Claimant contends that the ALJ's step three analysis of her cervical spine impairment and migraines was not supported by substantial evidence. Claimant argues that the ALJ's analysis of her cervical spine impairment under Listing 1.04 was conclusory, inconsistent with the ALJ's subsequent discussion of the evidence, and that the ALJ failed to apply any of the evidence to the listing criteria. (ECF No. 14 at 9-11). Claimant asserts that the analysis of her migraine headaches was similarly deficient because the ALJ did not identify the specific listing under Listing 11.00 that was considered, did not acknowledge that her headaches were to be considered under Listing 11.03, and did not compare the evidence to the listing criteria. (*Id.* at 12).

Claimant also challenges the ALJ's assessment of her pain and credibility.

Specifically, Claimant argues that the ALJ erred in relying almost exclusively on objective evidence to discredit allegations of disabling pain from headaches. (ECF No. 14 at 5-9). Claimant points to case law emphasizing that migraine headaches are not detectable in laboratory testing and physical examinations; therefore, an ALJ should not rely on the absence of objective evidence of migraine headaches to discredit a claimant's allegations of pain. (*Id*. at 7-8). Claimant states that the ALJ did not demonstrate how Claimant's statements were inconsistent with the evidence. Moreover, the ALJ selected and presented evidence in a manner designed to favor his own conclusions. (ECF No. 14 at 5-6).

In response to Claimant's arguments, the Commissioner argues that the record did not contain probative evidence that Claimant met or equaled any of the listed impairments; therefore, any further articulation than the ALJ provided was unnecessary. Regarding Claimant's cervical spine impairment, the Commissioner states that the ALJ correctly found that Claimant could not meet the introductory criteria of Listing 1.04 because there was no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. (ECF No. 17 at 17-19). Further, the Commissioner argues that the record showed that Claimant did not suffer sensory loss, which was required under the listing. (*Id*. at 18-19). Regarding Claimant's headaches, the Commissioner contends that the ALJ thoroughly reviewed the evidence, which showed an absence of symptoms normally associated with migraines such as photophobia, sonophobia, nausea, or vomiting; daily activities that were inconsistent with Claimant's complaints; and testimony by a medical expert that Claimant did not meet a listing. (*Id*. at 19-22).

As to Claimant's pain and credibility, the Commissioner asserts that the ALJ correctly analyzed Claimant's allegations regarding her headaches by considering a number of factors, not just the lack of objective evidence, including the fact that Claimant underwent little treatment prior to 2011, the type of treatment Claimant received or used, the lack of associated symptoms, and Claimant's daily activities. (*Id.* at 23-25). Further, the Commissioner points out that the ALJ accounted for Claimant's pain in the RFC finding, noting that Claimant had chronic pain noticeable to her at all times, but still had the ability to maintain attention and concentration in two-hour increments. (*Id.* at 25).

## V.   Relevant Evidence

While the undersigned has reviewed all evidence of record, only the notations most relevant to the disputed issues are summarized below:

### A. Treatment Records

On December 8, 2011, a MRI was taken of Claimant's cervical spine due to her complaints of neck and arm pain. Claimant had some moderate disc degeneration and narrowing at C4-5 and C3-4, as well as mild degeneration and narrowing at C5-6 and C6-7, but there was no contact with Claimant's spinal cord. (Tr. at 396). Claimant also had a MRI of her thoracic spine, which was an "essentially negative" examination. (Tr. at 397).

Shortly thereafter, on December 21, 2011, Claimant presented to Gregg A. Alexander, M.D., at Tallahassee Orthopedic Clinic, for chronic neck and back pain. (Tr. at 472). Claimant stated that she remained symptomatic despite trying physical therapy. (*Id.*). Dr. Alexander reviewed the MRIs of Claimant's spine taken earlier that month, noting that in Claimant's cervical spine, there was moderate disc/osteophyte

7

at C4-5 and C5-6, but no central canal narrowing or neuroforaminal narrowing of significance. Dr. Alexander found the imaging, overall, reflected an essentially normal MRI for an individual of Claimant's age. He also saw no significant abnormalities in Claimant's thoracic spine. (*Id.*). Dr. Alexander remarked that Claimant's spine was normal in size and signal throughout. (*Id.*). On examination, Claimant had mild/moderate tightness in her neck and upper back, rapid withdrawal from light touch, and diffuse muscle tenderness, but no neurological deficits. (*Id.*). Dr. Alexander diagnosed Claimant with cervical disc degeneration at C4-5 and C5-6 that was moderate in severity, without any compressive lesion or clinical findings of spinal cord or nerve root compression, and mid-back pain with a normal MRI. (Tr. at 472). Dr. Alexander offered a prescription for Fioricet to Claimant to take as needed for muscle tension headaches. (*Id.*). Dr. Alexander documented that he tried to reassure Claimant that her spine anatomy did not require surgery and was not extreme. (*Id.*).

On November 2, 2012, Claimant presented to Deborah E. Newsome, ARNP, for a disability examination because her request for benefits was recently denied. (Tr. at 422). Claimant reported neck pain and exhibited trapezius spasms bilaterally on examination. (Tr. at 422, 424). Claimant stated that her neck pain and spasms were somewhat relieved by Flexeril; thus, the medication was refilled. (Tr. at 426). Claimant also reported intermittent headaches for which she took Fioricet in the past with relief of symptoms. (Tr. at 425). Claimant's prescription for Fioricet was renewed, and she was advised to rest in a dark room when she had a headache. (*Id.*).

On August 14, 2013, Claimant returned to Ms. Newsome, stating that she was experiencing persistent headaches that she rated a "10" out of "10" in severity, which began one month prior. (Tr. at 427). Claimant also continued to have neck pain. (*Id.*).

8

Her neck pain was assessed to be cervicalgia for which Flexeril was renewed. (Tr. at 429). For her headaches, Claimant was prescribed the opioid pain medication, Tramadol, and the nonsteroidal anti-inflammatory drug (NSAID), Mobic. (*Id.*).

On May 29, 2014, x-rays were taken of Claimant's lumbar, thoracic, and cervical spine with normal results; it was noted that if Claimant had further unexplained pain, a MRI or bone scan should be considered. (Tr. at 520-22). The following month, on June 17, 2014, Claimant presented as a new patient to Jessica M. Shreve, M.D., at Rosemar Clinic, to establish her primary care in West Virginia after moving from Florida. (Tr. at 582). Claimant explained that she suffered from neck and back pain and headaches that began several years ago when her mother, who suffered hallucinations secondary to a hypoglycemic episode, pushed Claimant into a door, twisting her neck, and kicked Claimant in the face. (*Id.*). Claimant stated that she saw a chiropractor over the past year with no relief. (*Id.*). She also complained that "nothing seemed to help" her headaches, although she did not regularly take Tylenol or ibuprofen. (*Id.*). On examination, Claimant had no tenderness, pain, or swelling in her cervical spine and she demonstrated normal movements, posture, and sensation. (Tr. at 584).

On July 7, 2014, Claimant reported to Dr. Shreve that she continued to have neck pain and a headache almost daily. (Tr. at 575). She went to Med Express on June 27 and was given Narco to try, but it provided no relief, and she had previously tried tramadol with no relief. (*Id.*). Claimant had a headache at the time of her visit, but felt well in general with no visual, auditory, or neurological symptoms. (Tr. at 576). On examination, Claimant had no tenderness in her cervical spine and normal movement, posture, and sensation. (Tr. at 577). Dr. Shreve ordered a CT scan of Claimant's head

and referred her for a neurosurgical consultation. (Tr. at 577).

On July 28, 2014, Claimant presented to Houman Khosrovi, M.D., at PARS Neurosurgical Associates, Inc. Claimant reported that she suffered neck pain extending into her head, resulting in headaches. (Tr. at 503). Claimant explained that the headaches began after her mother shut Claimant's neck in a door and kicked her on both sides of her face in July 2013. (*Id.*). Claimant's musculoskeletal and neurological examinations were normal, except that Claimant had a moderately reduced range of motion in her cervical spine. (Tr. at 506-07). Claimant maintained a normal range of motion in her extremities; had no atrophy; demonstrated normal muscle tone, strength, and movement; and her sensation was intact. (*Id.*). Claimant was assessed with a headache and cervicalgia and the plan was for her to pursue physical therapy. If she continued to be symptomatic, Dr. Khosrovi would order a MRI. (Tr. at 507).

On September 15, 2014, Claimant returned to PARS Neurosurgical Associates, Inc., and saw Brian P. Showalter, PA-C. She reported having completed four weeks of physical therapy, but the sessions were discontinued by the therapist because Claimant was not experiencing any relief of her symptoms. (Tr. at 508). Claimant further reported that she tried Mobic for two months, but it was discontinued due to kidney disease, and she stated that muscle relaxers offered modest relief. (*Id.*). Mr. Showalter ordered a MRI of Claimant's cervical spine to assess the source of her pain. (Tr. at 511).

Prior to the MRI, Claimant saw Dr. Shreve on September 30, 2014. Claimant likewise stated that physical therapy was not helping her neck pain and associated headaches. (Tr. at 569). Claimant was experiencing a headache at the time, but otherwise was generally feeling well. She denied any visual or auditory symptoms, nausea, dizziness, or other neurological symptoms. (Tr. at 570).

A MRI of Claimant's cervical spine was taken on October 6, 2014. It showed no significant change since her previous MRI on December 8, 2011 and no acute findings. (Tr. at 513). Gregory S. Meyers, M.D., assessed that Claimant had cervical radiculopathy, headache, cervical pain, and cervical spondylosis without myelopathy. (Tr. at 514).

On October 22, 2014, Claimant reported to Dr. Shreve that her neck pain was worsening and causing more severe headaches. (Tr. at 565). Claimant reported that oxycodone, Toradol, and ibuprofen did not help, and the oxycodone caused unwanted side effects. (*Id.*). Despite the above, Claimant reported that she was feeling well and denied having any visual, auditory, or neurological symptoms. (Tr. at 566). On examination, Claimant did not have tenderness in her cervical spine and her movement, posture, and sensation were normal. (*Id.*).

Claimant followed up with Dr. Shreve in the subsequent two months for the removal of skin tags and a urinary complaint. During her visit on November 12, 2014, Claimant was feeling well and, although she had a headache, she denied visual or auditory symptoms. (Tr. at 559). On December 18, 2014, Claimant still felt well and did not have a headache or any visual, auditory, or neurological symptoms. (Tr. at 554).

On January 15, 2015, Claimant presented to Malcolm B. Louden, M.D., at Parkersburg Neurology Associates, Inc., due to her complaint of intractable headaches. Claimant stated that she had experienced a daily headache for the prior couple of years, beginning a couple of weeks after her mother kicked her in the jaw twice while having a "sugar episode." (Tr. at 529). The headache did not throb and was not associated with photophobia, sonophobia, nausea, or vomiting. It also was not influenced by position or activity. (*Id.*). Claimant complained of chronic neck pain for which she was taking

Tramadol, but she had not taken any pain medication in the past year or so because medication did not seem to help. However, she did take the anticonvulsant, Topiramate, daily. (*Id.*). Dr. Louden assessed Claimant with an intractable headache, likely associated with an underlying tendency to have a migraine. (Tr. at 530). Dr. Louden felt that there was a strong suggestion of an underlying lesion causing Claimant's headache, and there was also probably medication overuse, which contributed to Claimant having chronic daily headaches. (*Id.*).

On January 23, 2015, Claimant reported to Dr. Shreve that she continued to have headaches that had not been successfully relieved with different medication attempts. (Tr. at 545). Several months later, on April 24, 2015, Claimant saw Dr. Louden's certified physician's assistant, Mr. Showalter, regarding her intractable headaches despite multiple medications. (Tr. at 823). After speaking with Dr. Louden, Mr. Showalter noted that a MRI was warranted to evaluate a possible intracranial source of Claimant's headaches. Although Claimant had cervical pathology, Dr. Louden did not believe that Claimant's neck problems were was the cause of her headaches. (*Id.*).

On March 13, 2015, Claimant followed up with Dr. Louden, stating that her headache had not improved since Dr. Louden increased her dosage of Topamax. (Tr. at 797). Claimant grimaced when Dr. Louden touched her frontal scalp or suboccipital regions. (*Id.*). Dr. Louden again increased Claimant's dosage of Topamax, but could not order a CT scan of Claimant's brain because it was deemed medically unnecessary. Dr. Louden suggested that Claimant ask Dr. Khosrovi to order laboratory testing as part of a pre-surgical assessment for potential neck surgery. (*Id.*). The following day, Dr. Khosrovi ordered a MRI of Claimant's brain, which did not show any significant

abnormalities. (Tr. at 846, 856, 928-29).

On May 29, 2015, Claimant saw Dr. Louden and continued to report no improvement from Topamax. (Tr. at 846). Dr. Louden stated that Claimant's MRI did not show any clear-cut abnormalities to explain her headaches. (*Id.*). His assessment was that Claimant probably suffered from migraines. (*Id.*). Claimant was prescribed Amitriptyline, and Dr. Louden noted that Inderal would be considered. (*Id.*).

On June 8, 2015, Claimant saw Mr. Showalter. He advised Claimant that her cervical spine MRI did not show any indication for surgery, and he recommended continued conservative treatment. (Tr. at 927). Further, the MRI of Claimant's her brain did not reveal show any findings that required neurosurgical intervention. (*Id.*). However, per the radiologist's recommendation, a follow-up MRI would be taken in 6 months to document stability of the findings. (*Id.*).

Claimant saw Dr. Louden again on August 31, 2015. Since her last visit, she tried Amitriptyline and then Propranolol, which were both ineffective. (Tr. at 971). Claimant reported having a daily headache that did not cease for any portion of the day, although she denied any associated symptoms. (*Id.*). Dr. Louden discussed starting the anti-seizure medication, Depakote, but Claimant expressed reservations about it due to her relative's experience using it. (*Id.*). Claimant could not receive Botox injections because insurance would not pay for it. (*Id.*).

Following Claimant's date last insured, Claimant had a follow-up MRI of her brain on December 16, 2015, which was compared to her previous study on May 14, 2015. There was no significant change from her previous MRI, no acute intracranial process, and no concerning findings. (Tr. at 22-23).

Claimant had numerous visits with Robert J. Williamson, D.C., at Mid Ohio Valley Chiropractic and Wellness, from November 2015 through April 2016. Claimant reported that her tension-type headaches continued, although it was noted that the headaches did not begin until November 2015. (Tr. at 10, 12, 14, 26, 28, 30, 32, 34, 36, 38, 40, 42, 44, 46, 48, 50, 52, 54).

### B. Evaluations and Opinions

On October 13, 2012, Charles Johnson, M.D., performed an internal medicine examination of Claimant for the Florida Disability Determination Services. Dr. Johnson noted that Claimant alleged neck pain, among other issues, but there was no mention of headaches. (Tr. at 409-10). Claimant's gait and station were normal; however, Claimant had slight difficulty getting on and off the examination table, up and out of a chair, walking on her heels and toes, and walking heel-to-toe. (Tr. at 411). She had moderate difficulty squatting and slightly decreased muscle strength in her extremities, but normal muscle tone with no atrophy. Her straight leg raising test was negative. (Tr. at 413). Claimant had slightly decreased grip strength, but had intact fine and gross motor manipulation. (*Id.*). Claimant's passive range of motion in her cervical spine and shoulder was restricted. (*Id.*). Overall, Dr. Johnson opined that Claimant could occasionally perform postural activities such as crouching, bending, and stooping. (*Id.*). He further concluded that Claimant had no limitation in sitting, standing, or walking, and could  frequently carry 10 pounds. (*Id.*).

Later in the month, on October 23, 2012, licensed psychologist Julian A. Salinas, Ph.D., performed a consultative psychological examination of Claimant in connection with her claim for disability benefits. During the examination, Claimant was observed to rise from a seated position and sit with no difficulty, as well as remain seated for a

14

prolonged period with no observed issues. (Tr. at 419). Claimant walked with a slow pace, but displayed an adequate gait and posture. (*Id.*). She did not complain of headaches.

On December 8, 2013, Lionel Henry, M.D., assessed Claimant's RFC based upon his review of Claimant's records. He concluded that Claimant could perform work at the light exertional level with no additional limitations. (Tr. at 159-60). Dr. Henry found Claimant to be only partially credible because her allegations were not entirely consistent with the evidence as a whole, including statements by Claimant and others, Claimant's activities of daily living, and the absence of alteration of her usual behavior or habits. (Tr. at 159).

On July 1, 2014, Dr. Shreve completed a physical capacities evaluation form, opining that Claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently. (Tr. at 500). Dr. Shreve found that Claimant could sit for a full work day, but could only stand or walk for 2 hours. (*Id.*). Claimant could occasionally perform gross and fine manipulation and tolerate environmental issues, but could rarely operate arm or leg controls, climb, balance, bend, stoop, reach, operate motor vehicles, or work with or around hazardous machinery. (*Id.*). Also, Dr. Shreve stated that Claimant would be absent from work more than 4 days per month due to her impairments. She explained that the basis for Claimant's assessed restrictions was Claimant's "known arthritis and disc bulging in [her] neck and back, causing high pain levels, [and] headaches, which are debilitating." (*Id.*). Dr. Shreve believed that Claimant's pain was present to such an extent to be distracting to adequate performance of daily activities or work and that physical activities greatly increased Claimant's pain. (Tr. at 501).

On February 2, 2015, Dr. Shreve completed a RFC questionnaire provided by Claimant's attorney. Dr. Shreve noted that Claimant had been her patient since June 2014, and Dr. Shreve saw Claimant almost monthly. (Tr. at 595). Claimant's diagnoses were fibromyalgia, multiple joint pain, chronic neck pain, and chronic headache. (*Id.*). Dr. Shreve noted that multiple attempts to treat Claimant's migraines failed, and the condition was likely related to arthritis in Claimant's cervical spine/neck. (*Id.*). Dr. Shreve did not believe that Claimant was a malingerer and opined that Claimant could only sit or stand for 15 minutes at a time and sit, stand, or walk less than 2 hours total in a work day. (Tr. at 595, 597). Claimant needed to shift positions during the day, including unscheduled breaks which allowed her to walk for 6 to 10 minutes more than 7 times per day. (Tr. at 597-98). Further, Dr. Shreve found that Claimant could rarely lift less than 10 pounds and could never lift and carry 10 pounds or more. (Tr. at 598). Claimant could rarely look down, turn her head right or left, or perform postural activities. (Tr. at 599). Also, Dr. Shreve opined that Claimant could only reach or perform gross or fine manipulation 10 percent of the work day and would be absent from work more than 4 days per month due to her impairments or treatment. (*Id.*). Overall, Dr. Shreve concluded that Claimant was not capable of working full time at any level of exertion since July 7, 2014. (Tr. at 600). The following month, on March 25, 2015, Claimant had a psychiatric evaluation during which Claimant reported that she "babysat for her first husband." (Tr. at 863).

On September 24, 2015, general surgeon Judith Brendemuehl, M.D., appeared as an impartial medical expert at Claimant's administrative hearing. (Tr. at 88). Regarding Claimant's neck pain, Dr. Brendemuehl testified that Claimant's MRIs were basically normal for her age, with no significant foraminal or canal stenosis; Claimant

was not recommended for surgery; and, although Claimant had some restriction in range of motion in her neck, she consistently had normal strength other than one aberrant examination by Dr. Shreve that was inconsistent with the neurosurgery and neurology records. (Tr. at 89-90). As to Claimant's headaches, Dr. Brendemuehl noted that Claimant suffered from daily headaches with multiple attempts to treat them; however, Dr. Brendemuehl stated that Dr. Louden documented that Claimant did not have any associated symptoms, even as late as August 31, 2015. (Tr. at 91-93). Overall, Dr. Brendemuehl opined that based on her analysis of all of Claimant's records, Claimant did not meet any of the listings and could perform light level work with occasional postural activities except that Claimant could never climb ladders, ropes, or scaffolds or be exposed to heights or hazardous machinery. (Tr. at 92). Dr. Brendemuehl did not feel that Claimant's headaches further reduced her RFC, noting that Claimant's headaches were not true migraines, but simply "a headache that [Claimant] function[ed] with daily." Dr. Brendemuehl pointed out that Claimant's stress test was normal; her daily activities included babysitting, and the fact that she was neurologically intact. (Tr. at 93-94).

### C. Claimant's Statements

On August 20, 2013, Claimant completed an adult function report, stating that she cared for her mother; including, doing the laundry, handling the bills, taking care of the house, and managing her mother's diabetic care. (Tr. at 312). She also cared for the household pets, including feeding them and letting them outside. (*Id.*). Claimant reported that she cooked daily, but had required help since the onset of her conditions. (Tr. at 313). She stated that her mother and her daughter helped her with all of the chores. (*Id.*). For leisure, Claimant watched television, read, and visited with family

every day. (Tr. at 315). She was currently taking Gabapentin, Tramadol, and Cyclobenzaprine. (Tr. at 318).

At the administrative hearing on September 24, 2015, Claimant testified that she stopped driving at least a year earlier and, before that, since her alleged onset date, she only drove 20 miles or less in one week. (Tr. at 104). Claimant took care of her mother for a couple of years when she lived in Florida; after that, she moved in with her significant other and his parents. (Tr. at 102, 105). In a typical day, Claimant woke up and made coffee; helped with dishes and making dinner, if needed; watched some television, but not too much because it worsened her headaches; went out to the porch; took care of her personal hygiene; crocheted; and used the computer a few hours total in a day because it greatly worsened her headaches. (Tr. at 105-07). On a weekly basis, Claimant did laundry. (Tr. at 105). Her significant other's mother did most of the cooking and grocery shopping, but Claimant accompanied her to the grocery store approximately once a month for a couple of hours at a time. (Tr. at 106). Claimant testified that she sometimes had to take naps because of her headaches, and her headaches sometimes woke her at night, but she averaged eight to ten hours of sleep per day. (Tr. at 107-08). Claimant stated that what kept her from working was primarily her headaches, which made it hard to be around people due to the noise, even if people were talking at a normal volume. (Tr. at 108). Further, Claimant stated that she had issues with her neck, back, and joints; if she sat at the computer for more than five or ten minutes, she experienced burning from her waist to the back of her head. (*Id.*). She estimated that she could stand or sit for 15 minutes at a time and noted that she had to use two hands to lift a gallon of milk. (Tr. at 108-09). Claimant described her pain as mostly dull, aching, numb, and tingling. (Tr. at 109). She took muscle

relaxers three times per day and Cymbalta. (Tr. at 110). She indicated that she was in constant pain, which she rated as "8" out of "10," and the pain increased to "10" out of "10" at times. (Tr. at 112). Claimant had to lie down for several hours when her headaches were at their worst. (Tr. at 113).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

### A. Step Three Analysis

Claimant contends that the ALJ's analysis of her cervical spine impairment and

headaches at step three of the sequential evaluation was conclusory and insufficient under prevailing law. First, Claimant contends that the ALJ's statement that Claimant did not have any "evidence of nerve root compression, spinal arachnoiditis, or lumbar stenosis" as required to meet Listing 1.04 is contradicted by the ALJ's later summary of the medical evidence. (ECF No. 14 at 11). Also, Claimant states that the ALJ failed to compare any of the evidence of her cervical spine impairment to the listing criteria, precluding meaningful judicial review. (*Id.*). Next, as to her headaches, Claimant argues that the ALJ erred in not identifying which specific listing under Listing 11.00 he considered, not acknowledging Listing 11.03, and likewise not comparing the evidence to the listing criteria. (*Id.* at 11-12). In support of her arguments, Claimant cites the holdings of the Unites States Court of Appeals for the Fourth Circuit ("Fourth Circuit") in *Radford v. Colvin*, 734 F.3d 288 (4th Cir. 2013) and *Fox v. Colvin*, 632 F. App'x 750 (4th Cir. 2015), which are discussed below.

A claimant should be found disabled at step three of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing in Appendix 1 of 20 C.F.R. Part 404, Subpart P. *See* 20 C.F.R. § 404.1520(a)(4)(iii). The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments are set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, (1990). Because the listed impairments presume disability, "[f]or a claimant to show

that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

In the Fourth Circuit, "where there is factual support that a listing could be met," the ALJ must consider whether the claimant's impairment meets or equals the relevant listing. *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000) (citing *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir. 1986)). "The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* at 390-91; *see, also, Ezzell v. Berryhill*, 688 Fed. Appx. 199, 200 (4th Cir. 2017) ("When there is 'ample evidence in the record to support a determination' that the claimant's impairment meets or equals one of the listed impairments, the ALJ must identify 'the relevant listed impairments' and compare 'each of the listed criteria to the evidence of the claimant's symptoms.'") (citing *Cook*, 783 F.2d at 1172-73) (internal markings omitted).

As is the case throughout the sequential evaluation process, the ALJ must set forth the reasons for the step three determination. *See, e.g.*, *Radford v. Colvin*, 734 F. 3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling.") (citing *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984)). An ALJ's explanation is insufficient if it only states that the ALJ considered the listing of impairments and offers nothing to reveal *why* the ALJ made his or her determination. *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) ("Our circuit precedent makes clear that it is not our role to speculate as to how the

ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record."). Likewise, it is generally unacceptable for an ALJ to summarily conclude that a claimant does not have an impairment or combination of impairments that meets a listing; the ALJ's decision must include a discussion that applies the pertinent legal requirements of the listing to the record evidence. *Radford*, 734 F.3d at 295. When evidence exists that a claimant meets a disability listing, but the evidence is rejected without discussion, "'insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings.'" *Coe v. Berryhill,* No. 1:15CV1077, 2017 WL 886858, at *3 (M.D.N.C. Mar. 6, 2017) (quoting *Bailey v. Colvin,* No. 1:14CV303, 2015 WL 5227646, at *3 (M.D.N.C. Sept. 8, 2015)). While an "ALJ is not required to explicitly identify and discuss every possible listing", the ALJ "is compelled to provide a coherent basis for [the] Step Three determination." *Ezzell*, 688 F. App'x at 200 (citation omitted).

In *Radford*, the Fourth Circuit found that an ALJ's step three analysis was "devoid of reasoning" and the ALJ's summary conclusion that the claimant did not meet a listing made is impossible for a reviewing court to evaluate whether substantial evidenced supported the ALJ's findings. *Radford*, 734 F.3d at 295. However, the Fourth Circuit noted that a full explanation by the ALJ was particularly important in Radford's case because the medical record included a fair amount of evidence supportive of his claim; in fact, the record contained five years of medical examinations and probative evidence strongly suggesting that Radford met or equaled the relevant listing. *Id.* Similarly, in *Fox*, the Fourth Circuit found that the ALJ failed to explain the step three finding despite inconsistent evidence in the file, including a treating physician's numerous statements about the claimant's severe limitations, which

22

possibly supported a finding that the claimant met the relevant listing. *Fox*, 632 F. App'x at 755 (4th Cir. 2015).

Despite the admonitions of the Fourth Circuit in *Radford* and *Fox* regarding an ALJ's duty of explanation at step three, "if the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three, such evidence may provide a basis for upholding the ALJ's determination." *McDaniel v. Colvin*, No. 2:14-CV-28157, 2016 WL 1271509, at *4 (S.D.W. Va. Mar. 31, 2016) (quoting *Smith v. Astrue*, 457 Fed. Appx. 326, 328 (4th Cir. 2011) ("Reading the ALJ's decision as a whole, substantial evidence supports the finding at step three of the sequential evaluation process as the ALJ's analysis at subsequent steps of the evaluation are inconsistent with meeting [the listing].")). Indeed, "the ALJ need only review medical evidence once in his opinion." *Id.* at *4 (quoting *McCartney v. Apfel*, 28 Fed.Appx. 277, 279 (4th Cir. 2002)). Ultimately, "[a] cursory explanation in step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." *Id.* (citing *Smith*, 457 Fed. Appx. at 328). Simply put, the written decision must demonstrate that the ALJ adequately performed all of the key tasks required by the sequential disability evaluation process. When the record includes conflicting evidence, or facts suggesting that the claimant might meet a listing, the ALJ's discussion is particularly important. Yet, "[i]f the court need not look beyond the ALJ's opinion to find substantial evidence supporting the ALJ's step-three determination, the ALJ's decision may be affirmed." *Marcum v. Berryhill*, No. CV 16-2297, 2017 WL 1095068, at *4 (S.D.W. Va. Mar. 23, 2017).

With the above principles in mind, the undersigned examines the ALJ's decision

as a whole to "determine whether the explanations and discussion necessary to support the pertinent listing requirements are contained within the ALJ's decision itself." *Id.* Addressing Claimant's first challenge to the ALJ's step three finding, the ALJ evaluated Claimant's degenerative disc disease of the lumbar and cervical spine under Listing 1.04, concluding that Claimant did not have "evidence of nerve root compression, spinal arachnoiditis, or lumbar spine stenosis as required to meet or equal the listing." (Tr. at 63). Listing 1.04 involves disorders of the spine, such as, herniated discs, spinal stenosis, degenerative disc disease, and facet arthritis, which result in compromise of a nerve root or the spinal cord. *See* 20 C.F.R., Part 404, Subpart P, Appendix 1, §1.04. In addition to these descriptive characteristics, the disorder must have:

> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight–leg raising test (sitting and supine); or
>
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an ability to ambulate effectively, as defined in 1.00B2b.

*Id.*

In this case, there is plainly no evidence of spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication in order to meet Listing 1.04B or 1.04C, respectively, nor does Claimant offer any argument that she met such listings. (ECF No. 14). Regarding Listing 1.04A, Claimant cites the ALJ's discussion of her limited range of motion and decreased muscle strength, which she contends is inconsistent

with the ALJ's finding that Claimant's cervical impairment did not meet the listing. (*Id.* at 11). However, to meet Listing 1.04A, Claimant must be able to show the presence of, or the equivalent of, *all* of the listing's criteria. Although the signs and symptoms need not be present "simultaneously" or "in close proximity to one another," Claimant must demonstrate that "each of the symptoms are present, and that [he] has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months." *Radford*, 734 F.3d at 294. The Fourth Circuit explained:

> A claimant need not show that each symptom was present at precisely the same time—i.e., simultaneously—in order to establish the chronic nature of his condition. Nor need a claimant show that the symptoms were present in the claimant in particularly close proximity. As the Commissioner recognizes, "abnormal physical findings may be intermittent," but a claimant may nonetheless prove a chronic condition by showing that he experienced the symptoms "over a period of time," as evidenced by "a record of ongoing management and evaluation."

*Id.*

Here, the ALJ's analysis of Claimant's cervical impairment was thorough and clearly demonstrated the ALJ's reasoning that Claimant did not meet Listing 1.04A. While the ALJ did not specifically include the discussion of the medical evidence at step three, the ALJ's explanation for his step three finding is clear from the decision itself. *McCartney*, 28 Fed. Appx. at 279 ("[T]he ALJ need only review medical evidence once in his decision"); *McDaniel v. Colvin*, No. 2:14-CV-28157, 2016 WL 1271509, at *4 (S.D.W. Va. Mar. 31, 2016)  ("A cursory explanation in step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion.").

As stated in the ALJ's decision, while a MRI of Claimant's cervical spine in December 2011 showed some moderate disc degeneration and stenosis and she

25

exhibited muscle tightness and tenderness in her neck during her examination, there was no cord compression and Claimant had no neurological deficits. (Tr. at 65). The ALJ also cited that, during Claimant's consultative examination in October 2012, although Claimant had limited passive range of motion in her cervical spine and shoulders, she had only slightly decreased muscle strength and normal tone with no evidence of atrophy. (*Id.*). Similarly, while Claimant again showed decreased range of motion in her neck on examination in August 2013, Claimant exhibited normal muscle strength. (*Id.*). Subsequently, although Claimant continued to complain of neck pain to Dr. Shreve in July 2014, Claimant's physical examination was normal. (*Id.*). The ALJ noted that Claimant's medical records from PARS Neurological Associates from July to October 2014 showed moderately reduced range of motion in Claimant's cervical spine, but no sensory deficits and normal muscle strength and tone without any atrophy. (Tr. at 66). Claimant's MRI in October 2014 confirmed no significant change in Claimant's cervical spine and Dr. Shreve's office notes that month showed that Claimant cervical range of motion was normal. In November and December 2014, Claimant "felt well overall." (*Id.*). In January 2015, Dr. Shreve documented slightly reduced muscle strength in Claimant's extremities and limited range of motion in Claimant's cervical spine, but Dr. Shreve noted that Claimant's sensation was intact. (*Id.*). Finally, the ALJ discussed that updated records from PARS Neurological Associates in April and June 2015 showed that despite Claimant's moderately reduced range of motion in her cervical spine, Claimant retained normal muscle strength in her extremities and her motor tone and sensation were normal with no muscle atrophy. (*Id.*).

As shown above, the ALJ's reasoning is clear that Claimant did not meet all of

the criteria in Listing 1.04A. Although Claimant did, at times, exhibit signs of reduced range of motion in her cervical spine and mildly reduced muscle strength, she did not suffer muscle atrophy and sensory or reflex deficits. The ALJ's above analysis is supported by substantial evidence. Dr. Alexander specifically stated in December 2011 that Claimant's cervical spine MRI showed essentially normal degenerative changes for her age and her repeat MRI in October 2014 showed no significant change and no acute findings. (Tr. at 472, 513). Further, Dr. Alexander unequivocally found that there were no neurological deficits or clinical findings of spinal cord or nerve root compression; he explained that Claimant's spinal anatomy did not require surgery and was not extreme. (Tr. at 472). Throughout 2014, Dr. Shreve documented that Claimant had normal movements, posture, and sensation, and Claimant denied having any neurological symptoms. (Tr. at 554, 566, 570, 576-77, 584). Dr. Khosrovi at PARS Neurological Associates noted in July 2014 that Claimant had no atrophy; normal muscle tone, strength, and movement; and intact sensation. (Tr. at 506-07). Moreover, the remainder of Claimant's records focused largely on Claimant's headaches and did not document findings to support the criteria in Listing 1.04A.

Noticeably, Claimant does not offer any evidence that she *does* meet any section of Listing 1.04. Rather, her argument is that the ALJ's step three finding lacked explanation and was inconsistent with his subsequent discussion of the medical evidence. However, as noted, Listing 1.04A requires several indicators of nerve root compression, including motor loss that is accompanied by sensory or reflex loss. As shown by the ALJ, Claimant's records demonstrated that she did not suffer motor loss accompanied by sensory or reflex loss; consequently, the ALJ appropriately found that Claimant's cervical impairment clearly did not meet or equal Listing 1.04A. Claimant's

reliance on the Fourth Circuit's rationale in *Radford* and *Fox* is misplaced in this instance because the ALJ's step three analysis is readily discernable from the ALJ's subsequent discussion within the decision. Furthermore, unlike *Radford* and *Fox*, the ALJ did not omit any critical analysis or neglect to address evidence which could potentially have satisfied the listing. Rather, in this case, it is plainly clear from the ALJ's decision why Claimant did not satisfy Listing 1.04, and the ALJ's conclusion is supported by substantial evidence in the record.

In her next challenge to the ALJ's decision, Claimant contends that the ALJ's step three analysis of her headaches, which stated only that her headaches were "evaluated under Section 11.00 of the Listings but are not of the severity required to meet or equal a Listing," is likewise deficient under prevailing Fourth Circuit law. There is not an express listing for headaches. However, "[w]here a claimant suffers from an unlisted impairment, the ALJ must compare the claimant's impairment with an analogous listed impairment." *McShane v. Berryhill*, No. CV 15-5137, 2017 WL 440269, at *3–4 (W.D. Ark. Feb. 1, 2017) (citing 20 C.F.R. § 404.1526). Here, the ALJ appropriately compared Claimant's headaches to the impairments described in Section 11.00 of the Listing, a section which pertains to Neurological Disorders. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.00. As noted by Claimant, chronic headaches and migraines are routinely analyzed under the criteria for Listing 11.03 (Epilepsy). *Cooper v. Berryhill,* No. 115-CV-1740SEB-MJD, 2017 WL 1055078, at * 3 (S.D. Ind. Mar. 21, 2017). The SSA's Program Operations Manual System ("POMS") at DI 24505.015(B)(7)(b) likewise identifies Listing 11.03 as the most "closely analogous" listed impairment to chronic migraine headaches. *McShane,* 2017 WL 440269, at *3; *see, also, Mann v. Colvin,* 100 F.Supp.3d 710, 719 (N.D. Iowa 2015); *Loree v. Colvin,*

No. 2:15-CV-251-JMC, 2016 WL 5107028, at *6 (D. Vt. Sept. 20, 2016) (noting that the

*SSA's National Q&A 09-036* confirms that "the most appropriate Listing for

consideration in [headache] cases is Listing 11.03").

In January 2017, Section 11.00 was substantially revised, *inter alia,* reserving

Listing 11.03. *Id.* However, at the time of the ALJ's decision on October 26, 2015,

Listing 11.03 stated the following:

> 11.03 Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

*Id.* at § 11.03. In the POMS at DI 24505.015, the SSA provides the following example

of how the analysis should be performed to determine if a claimant's migraine

headaches medically equal Listing 11.03:

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly. Due to all of her symptoms, she has difficulty performing her [activities of daily living]. The claimant takes medication as her doctor prescribes. The findings of the claimant's impairment are very similar to those of 11.03, Epilepsy, nonconvulsive. Therefore, 11.03 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment. Therefore, the claimant's impairment medically equals listing 11.03.

Courts that have discussed the proper way to evaluate headaches have provided further

guidance on how migraine headaches may be examined for equivalency to Listing

11.03. *See Dunlap v. Colvin,* No. 15-CV-02139-NYW, 2016 WL 5405208, at *9 (D. Colo.

29

Sept. 28, 2016); *Plummer v. Colvin*, No. CV-13-08282-PCT-BSB, 2014 WL 7150682,

at *10 (D. Ariz. Dec. 16, 2014); *Mesecher v. Berryhill*, No. 4:15-CV-0859-BL, 2017 WL

998373, at *3–5 (N.D. Tex. Mar. 15, 2017). In *Mesecher,* the court suggested using the

following criteria:

> Migraine headaches, documented by detailed description of a typical
> headache event pattern, including all associated phenomena, e.g.,
> premonitory symptoms, aura, duration, intensity, accompanying
> symptoms, and treatment; occurring more frequently than once weekly,
> counting characteristic headache events. With (1) alteration of
> awareness, which means a condition of being inattentive, or not
> cognizant of one's surroundings and external phenomena as well as one's
> personal state or (2) significant interference with activity during the day
> that may result from, e.g., a need for a darkened, quiet room; lying down
> without moving; or a sleep disturbance that impacts on daytime
> activities.

*Id.* at 4.

In this matter, the ALJ discussed the medical evidence concerning Claimant's

headaches, noting that Claimant reported relief with Fioricet in November 2012. (Tr.

at 65). The ALJ further discussed that although Claimant later reported no relief with

medications in October 2014, she stated to Dr. Shreve that she generally felt well

overall in November and December 2014. (Tr. at 66). Claimant was referred to

neurologist Dr. Louden for her headaches and as late as January 2015 denied

photophobia, sonophobia, nausea, or vomiting. (*Id.*). Although Claimant asserted that

none of the prescribed medications alleviated her headaches, she did not relate any

associated symptoms. (*Id.*). Furthermore, the ALJ noted that Claimant's daily activities

were "essentially normal," including reading; watching television; crocheting; assisting

with household chores, meals, and grocery shopping; visiting others; following

instructions well; and taking care of her personal needs. (Tr. at 67). Also, the ALJ cited

that Claimant cared for her infirmed mother for a couple of years. (*Id.*). The ALJ noted that Dr. Brendemuehl testified that Claimant did not have any additional symptoms associated with her daily headaches and the condition did not impose any additional limitations "other than a daily headache." (*Id.*).

Overall, the ALJ's decision clearly articulates the ALJ's reasoning that Claimant's headaches did not produce any associated phenomena or interference with daily activities sufficient to meet any sections of Listing 11.00. This finding is supported by substantial evidence. Although Claimant continued to complain of intractable headaches throughout the period at issue, she unequivocally denied visual, auditory, or neurological symptoms. (Tr. at 529, 554, 559, 566, 570, 576, 971). Dr. Louden specifically stated in January 2015 that Claimant's headaches were not throbbing and were unassociated with photophobia, sonophobia, nausea, or vomiting. (Tr. at 529). Furthermore, there was no evidence that Claimant's headaches altered her sense awareness. Although Claimant testified during the administrative hearing in September 2015 that her headaches made her sensitive to noise and required her to lie down in a dark room for several hours when they were at their worst, Claimant's statements of her numerous daily activities fully supports the ALJ's assessment that Claimant's headaches did not interfere with her life to the degree that they rendered her presumptively disabled. (Tr. at 102, 105-07, 113, 312-13, 315). For the above reasons, the undersigned concludes that the ALJ's decision provides substantial support for the ALJ's step three finding that Claimant's headaches did not render her presumptively disabled. Although the ALJ did not spell out that he considered Listing 11.03, the ALJ unequivocally compared Claimant's headaches to the criteria of that listing. Moreover, the ALJ analyzed and discussed the evidence that is pertinent to

Listing 11.03 and his reasoning for concluding that Claimant did meet such listing is clear from the face of the decision.

Therefore, the undersigned **FINDS** that the ALJ's step three findings regarding Claimant's cervical spine impairment and headaches complied with applicable law and were supported by substantial evidence.

### B. Pain Analysis and Credibility Analysis

Claimant also challenges the ALJ's analysis of her pain and credibility, arguing that the ALJ relied "almost exclusively on objective evidence to discredit [her] allegations of disabling pain" from headaches. (ECF No. 14 at 6). Claimant cites the undersigned's recent discussion in *Eden v. Berryhill* in which the undersigned found that the ALJ failed to consider the nuances associated with migraine headaches in assessing the claimant's pain and credibility. (*Id.* at 8); *see Eden v. Berryhill*, No. 2:16-CV-03703, 2017 WL 1404380, at *19 (S.D.W. Va. Mar. 28, 2017), *report and recommendation adopted,* 2017 WL 1398341 (S.D.W. Va. Apr. 18, 2017). Claimant notes that, as the undersigned emphasized in *Eden*, migraines are not detectable in laboratory testing unlike many conditions; as such, an absence of objective evidence of migraines is not determinative. (*Id.*). Claimant contends that like the ALJ in *Eden*, the ALJ did not provide any analysis to support his conclusion that her statements were inconsistent with the medical evidence and the ALJ did not properly evaluate all of the factors that he was required to consider under 20 C.F.R. § 404.159(c) and SSR 96-7p. (*Id.* at 9).

Under the Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. § 404.1529. First, the ALJ must

consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* § 404.1529(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity),

precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. § 404.1529(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5.

> In *Hines v. Barnhart*, the Fourth Circuit stated that:
>
> **Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.**

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations, the lack of objective medical evidence is one factor that may be considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

In its rulings, the SSA provides further guidance on how to evaluate a claimant's credibility, stating "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also

"lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this matter, the ALJ applied the two-step method to assess the reliability of Claimant's statements. First, the ALJ determined that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. at 64). Second, the ALJ concluded that Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (*Id.*). The ALJ stated that although Claimant alleged disability beginning in May 2010, there was minimal evidence prior to 2011. (Tr. at 64-65). As to

Claimant's headaches, the ALJ cited that Claimant reported in November 2012 that she had intermittent headaches with relief from Fioricet. (Tr. at 65). During her initial examination with Dr. Shreve in June 2014, Claimant stated that nothing helped her headaches, neck pain, and fibromyalgia, but acknowledged that she did not regularly take Ibuprofen or Tylenol. (*Id.*). The ALJ discussed that although Claimant reported intractable headaches to Dr. Shreve, she continued to state that she generally felt well overall. (Tr. at 65-66). The ALJ reviewed Claimant's treatment with Dr. Louden, noting that notwithstanding Claimant's intractable headaches, Claimant denied photophobia, sonophobia, nausea, or vomiting. (Tr. at 66).

As a whole, the ALJ found that Claimant's headaches and other impairments did cause some limitations, but not to the severity alleged. (*Id.*). The ALJ noted that at times, Claimant did not even take over the counter medications, which the ALJ found to be inconsistent for an individual who alleged such severe pain. (Tr. at 67). Claimant also reported babysitting for her first husband, taking care of her mother for a couple of years, and living an "essentially normal" daily life of an unemployed person. (*Id.*). The ALJ also gave great weight to the opinion of Dr. Brendemuehl, who had the opportunity to review the entire record and opined that Claimant could perform a limited range of light work. Dr. Brendemuehl testified that despite Claimant's daily headaches, she had no other symptoms and "there are no limitations other than a daily headache." (Tr. at 67).

This case is easily distinguished from *Eden* and other similar cases in which an ALJ improperly relied on the lack of objective evidence to discount a claimant's subjective complaints regarding headaches. *See, e.g., Moss v. Berryhill*, No. 2:16-CV-05016, 2017 WL 4296637, at *21 (S.D.W. Va. Apr. 27, 2017), *report and*

*recommendation adopted,* No. 2:16-CV-05016, 2017 WL 4294206 (S.D.W. Va. Sept. 27, 2017) (The ALJ incorrectly discounted the claimant's credibility on the basis that she complained of migraine headaches even though her brain MRI was normal); *Harrington v. Colvin,* No. 7:15-CV-00020-FL, 2016 WL 320144, at *4 (E.D.N.C. Jan. 4, 2016), *report and recommendation adopted,* No. 7:15-CV-20-FL, 2016 WL 311284 (E.D.N.C. Jan. 25, 2016) (The ALJ's reliance on the unremarkable results of the brain CT scan and lack of objective evidence was improper).

Here, the ALJ did not focus on the lack of objective evidence to discredit Claimant's allegations of disabling pain from headaches. Rather, the ALJ carefully reviewed Claimant's allegations, medical treatment, daily activities, and the opinion evidence. Ultimately, after performing his duty of analyzing and weighing the evidence, the ALJ concluded that Claimant was not as limited as she alleged. As shown above, the ALJ provided clear reasons, supported by the record, for his assessment that Claimant's statements were not fully credible. The ALJ did not address the credibility issue in a conclusory fashion, nor did the ALJ impermissibly find Claimant's representations to be less than fully reliable solely because there was no objective evidence to support Claimant's statements. Rather, the ALJ analyzed the record and found that notwithstanding Claimant's headaches, there was little evidence prior to 2011 and even then, Claimant repeatedly stated to Dr. Shreve that she generally felt well overall, had no associated symptoms, cared for her mother for two years, and continued to perform essentially normal daily activities. (Tr. at 66-67). As noted, it is not the Court's role to re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays,* 907 F.2d at 1456. Rather, the Court must only review the

evidence to determine if it is sufficient to support the ALJ's conclusions. In this case, the undersigned **FINDS** that the ALJ's credibility analysis was properly conducted in compliance with the applicable mandates, and his determination was supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 14); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 17); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766

F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** February 1, 2018

Cheryl A. Eifert
United States Magistrate Judge